**E-FILED**
Monday, 18 August, 2008  02:46:22 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES  DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### Urbana Division

| | | |
|---|---|---|
| **GLENN PROFIT,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| | ) | **Case No. 07-2148** |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** | ) | |
| **Defendant.** | ) | |

# REPORT AND RECOMMENDATION

In September 2006, Administrative Law Judge (hereinafter "ALJ") Barbara Welsch denied Plaintiff Glenn Profit's application for social security supplemental security income and disability insurance benefits.  The ALJ based her decision on a finding that Plaintiff's impairments did not prevent him from returning to past relevant work.

In August 2007, Plaintiff filed a Complaint (#4) against Defendant Michael J. Astrue, the Commissioner of Social Security, seeking judicial review of the ALJ's decision to deny social security benefits.  In April 2008, Plaintiff filed a Motion for Summary Judgment or Remand (#17).  In May 2008, Defendant filed a Motion for an Order Which Affirms the Commissioner's Decision (#19).  In June 2008, Plaintiff filed a Reply in Support of His Motion for Summary Judgment or Remand (#22).  After reviewing the administrative record and the parties' memoranda, it is my recommendation pursuant to authority conferred to me under 28 U.S.C. § 636(b)(1)(B) that Plaintiff's Motion for Summary Judgment or Remand **(#17)** be **DENIED**.

## I.  Background

### A.  Procedural Background

Plaintiff filed applications for benefits in August 2004 and June 2006, alleging that he became disabled in February 2003.  (R. 86.)  Plaintiff states he is disabled due to obesity, diabetes, asthma, hypertension, and damage to his muscles and lungs.  (R. 113.)  The Social Security Administration (hereinafter "SSA") denied his applications both initially and on

reconsideration.  (R. 48-53, 55-59.)  Plaintiff requested a hearing, which the ALJ held in August 2006.  He was represented by counsel at the hearing.  In September 2006, the ALJ denied the applications and Plaintiff appealed the denial.  In April 2007, the Appeals Council denied Plaintiff's request for review, but then set aside that action to review additional evidence.  (R. 5, 13-15.)  In June 2007, the Appeal Council again denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  Plaintiff then filed his complaint in federal court pursuant to 42 U.S.C. § 405(g).

### B.  Plaintiff's Background

Plaintiff was forty-nine years old on his alleged onset date and fifty-three years old at the time of the ALJ's decision.  (R. 86.)  He has completed high school.  (R. 118.)  His past relevant work is telemarketing.  (R. 128.)

### C.  Medical Evidence

Plaintiff's relevant medical records span from June 2000 to April 2007.  The following account of the relevant medical evidence is in chronological order.

In June 2000, Plaintiff sought emergency room (hereinafter "ER") treatment at Arrowhead Regional Medical Center (hereinafter "Arrowhead") for pain between his shoulder blades.  Doctors diagnosed acute upper back strain.  Doctors noted that Plaintiff was morbidly obese and that he reported smoking, drinking, and occasionally using cannabis and cocaine.  (R. 296.)

In 2003, Plaintiff sought treatment at Arrowhead ER on several occasions for a variety of ailments.  In February 2003, he complained of a cough, fever, and headache.  At a follow-up appointment, Plaintiff was experiencing shortness of breath and pedal edema (leg or ankle swelling).  (R. 286.)  Also, in response to Plaintiff's complaints of abdominal pain, doctors performed an abdominal ultrasound, and they found some evidence suggesting Plaintiff had an enlarged liver.  (R. 281-84.)  Doctors noted Plaintiff used tobacco, alcohol, and drugs.  (R. 286.)  In March 2003, Plaintiff returned to the ER with complaints of generalized bone pain, cough,

dysuria, and headache.  Doctors determined he had rales bilaterally in his chest, pitting edema in both legs, and a positive cervical lymphadenopathy.  (R. 278-79.)  Doctors diagnosed arthritis, Reiter's syndrome, upper respiratory infection, bronchitis, and congestive heart failure.  (R. 279.)

In September 2003, Plaintiff tripped and fell.  He subsequently sought treatment for a broken foot, a sprained ankle, and other complaints of pain associated with the fall.  Immediately after the accident, Plaintiff went to Arrowhead ER, where doctors performed an x-ray of his left ankle.  The x-rays showed swelling and a fractured bone in his foot.  (R. 274-76.)  Doctors gave him a splint, crutches, and Motrin for pain.  (R. 275.)  Plaintiff returned to Arrowhead a few days later with complaints of continuing pain.  Doctors put a cast on his foot.  (R. 272-73.)

In October 2003, Plaintiff continued to experience pain.  At an appointment with Dr. Hoon Choi, a chiropractor, Plaintiff complained of pain in his neck, shoulders, upper and lower back, and knees, which he said resulted from his fall.  Dr. Choi noted tenderness, muscle spasms, and limited range of motion.  (R. 354.)  Dr. Choi noted that the objective findings were consistent with Plaintiff's complaints of pain.  (R. 355.)  Dr. Choi provided therapy and chiropractic treatments through February 2004.  Upon Plaintiff's discharge, Dr. Choi noted that Plaintiff showed signs of marked improvement related to his reflexes and strength, and she released him with a guarded prognosis.  (R. 355.)  Later in October, Plaintiff returned to Arrowhead for another x-ray of his foot, which revealed increased displacement of his fracture. (R. 269.)

On November 26, 2003, Plaintiff arrived at San Antonio Community Hospital with a stab wound to his left chest.  Doctors noted a small pleural effusion.  He was discharged four days later with instructions to obtain a chest x-ray at Arrowhead in one week.  (R. 168-69.)

Plaintiff arrived at Arrowhead on December 2, 2003, and received inpatient treatment for the stab wound until his release on December 29.  On December 2, doctors performed an x-ray and noted increased left pleural fluid collection and possible adjacent infiltrate, as well as a right base atelectasis (collapsed lung).  (R. 265.)  They also performed a CT scan, which revealed a

3

moderate-sized left hemothorax, left lobe atelectasis and hematoma, and left rib fractures.
(R. 264.) On December 7, Dr. David Wong performed surgery to drain the pleural effusion.
(R. 262-63.) Follow-up Dopplar studies showed mild left ventricular hypertrophy, mild aortic
root enlargement, and a trace of mitral and tricuspid regurgitation and pulmonic insufficiency.
(R. 258-59.)

On December 15, 2003, Plaintiff underwent an examination to assess possible congestive
heart failure. (R. 260.) Dr. Sunil Nowrangi noted Plaintiff occasionally drank alcohol and
regularly smoked cigarettes and used drugs including cocaine. (R. 260.) Dr. Nowrangi stated
that a physical examination revealed no evidence of decompensated congestive heart failure, but
due to elevated BNP levels he could not completely rule out this diagnosis. He also noted
Plaintiff had anemia, leukocytosis, morbid obesity, and a preserved left ventricular ejection
fraction of 65%. (R. 261.) He recommended no further cardiac testing at that time. On
December 29, 2003, Plaintiff underwent a thoractomy and then was discharged from Arrowhead.
(R. 256.)

Throughout winter 2004, Plaintiff returned to Arrowhead ER on a number of occasions
for further treatment related to the stab wound. On January 6, an x-ray showed residual lung and
pleural changes in the left base following surgery. (R. 254.) Doctors treated Plaintiff for wound
discharge, pneumonia, and anemia. (R. 252-54.) Chest x-rays performed on January 9 and
January 17 showed persistent left lobe pneumonia and pleural effusion. A CT scan showed
atelelactasis and unchanged mediastinal lymphadenopathy. (R. 243-46, 248.) Plaintiff returned
to the ER on January 18 seeking a higher dose of his pain medication. Doctors noted Plaintiff
was angry and uncooperative. (R. 159.) In February, Plaintiff returned to Arrowhead with
continued complaints of muscle and chest pain, muscle spasms, and difficulty sleeping. Doctors
supplied more pain medication and sleeping pills. (R. 233-34.)

Throughout the rest of 2004, Plaintiff returned to Arrowhead with a variety of ailments.
In April, Plaintiff came to Arrowhead ER with leg pain, edema, and sores on his buttocks.
(R. 219-20.) In May, Plaintiff complained of right ear pain and decreased hearing, apparently

from being punched in the head.  (R. 215.)  In November 2004, Plaintiff returned to Arrowhead with complaints of difficulty breathing and doctors diagnosed asthma with acute bronchospasm. (R. 209-11.)

In October 2004, Dr. Keith Simpson treated Plaintiff for approximately a month. Dr. Simpson diagnosed poly drug dependence, hypertension, back pain, and type two diabetes. He noted that progressive use of alcohol, opiates, and benzodiazipines were creating problems for Plaintiff with his family, work, and health.  (R. 194.)  He prescribed pain medication and medication to lower Plaintiff's blood pressure.  (R. 195.)  Dr. Simpson opined that Plaintiff was incapable of performing his past work.  (R. 194.)

Plaintiff visited Arrowhead ER many times in 2005.  Plaintiff returned to Arrowhead ER twice in January 2005.  The first time, doctors noted that Plaintiff was experiencing muscle spasms and constipation, and that he had jaundice.  (R. 200.)  Plaintiff requested pain medication and muscle relaxants.  (R. 199.)  He returned two days later for a medication refill.  (R. 197.)  In March 2005, Plaintiff came in with complaints of difficulty breathing and pneumonia; doctors gave him Albuterol and Prednisone.  (R. 352.)  In May 2005, Plaintiff complained of hand pain. X-rays showed a foreign body in the soft tissue of his left hand, and fusion of the right phalanges and an old ulnar styloid fracture in his right hand.  (R. 349.)  In October 2005, Plaintiff returned with complaints of asthma and right foot pain.  An x-ray showed swelling and degenerative changes.  (R. 345-48.)

In March 2005, a non examining State agency physician completed a physical residual functional capacity assessment (hereinafter "RFC").  That physician determined Plaintiff could do medium level work with occasional climbing, balancing, kneeling, and crawling.  The physician noted that Plaintiff should avoid exposure to temperature extremities, humidity, and workplace hazards such as machinery or heights.  The doctor advised that Plaintiff should avoid all exposure to environments with fumes, odors, dusts, gases, or poor ventilation.  The doctor stated that "allegations are partially credible and not all are fully supported by MER in file." (R. 309.)

In September 2005, Plaintiff saw Dr. Mark Greenspan, an orthopedic surgeon, for evaluation and treatment, apparently in connection with a pending personal injury lawsuit related to Plaintiff's fall in September 2003.  Dr. Greenspan wrote that Plaintiff complained of sharp pain throughout his spine, shoulders, arms, left leg, and left foot.  At that time, Plaintiff weighed 300 pounds.  Dr. Greenspan listed twenty-four objective findings, including tenderness and muscle spasms throughout the spine, a 50% restriction in right and left lateral flexion of the cervical spine, a 25% restriction in left rotation of the cervical spine, a positive Phalen's test on the right, and pain elicited with direct pressure on a number of joints.  Dr. Greenspan noted that Plaintiff walked with an abnormal gait, that he used a cane, and that toe walking, heel walking, and squatting caused low back pain and spasms.  In a forward flexion of the lumbar spine, Plaintiff's fingertips missed the floor by thirty inches.  Right and left lateral bending of the lumbar spine was restricted by 75% with moderate pain and spasm.  Dr. Greenspan noted ten diagnostic impressions including sprains of the cervical spine, thoracic spine, lumbar spine, bilateral shoulders, bilateral upper extremities, and left leg; contusions bilaterally in shoulders; bilateral impingement syndrome; and a fractured left ankle/foot, per history.  In his concluding remarks, Dr. Greenspan noted the problems related to the cervical spine and left foot and ankle were the most problematic (R. 363-71) and ordered an MRI, which revealed a disc bulge, edema, and bone cysts in the left foot and signal abnormality in the talus of the left ankle (R. 359; 361). Dr. Greenspan released Plaintiff with a guarded prognosis, noting that Plaintiff would need intermittent physical therapy two to three times a year for two to three weeks at a time, and that he had "received maximum medical bending [sic] of medical care for his condition."  (R. 358.)

In October 2005, Plaintiff saw Dr. Lawrence Mozan, an orthopedic surgeon, for an evaluation, again in connection with a pending lawsuit related to Plaintiff's September 2003 slip and fall.  Plaintiff claimed his neck, hands, arms, back, and legs hurt immediately after the accident, but Dr. Mozan noted that this was inconsistent with the records from Arrowhead following that accident.  (R. 372.)  Dr. Mozan wrote that Plaintiff's present complaints included radiating neck pain and radiating low back pain.  (R. 373.)  Dr. Mozan performed a physical examination, and wrote that Plaintiff walks with a waddling gait because of his obesity.  In contrast to Dr. Greenspan's findings, Dr. Mozan wrote:  "There is a full range of motion of the

6

cervical spine in all planes . . . .  There are no complaints of pain with any of these actively performed motions," and "[t]here was full range of motion of all major joints of both upper extremities with no abnormal ligamentous laxity or complaint of pain."  (R. 374.)  Dr. Mozan also found limitation in motion and biceps reflex due to obesity, possible dextroscoliosis, reduced bending to only fifteen degrees, and limited knee motion and neck and back pain. (R. 472-76.)  Dr. Mozan wrote, "[h]is objective orthopedic examination today does not support claims of any traumatically induced pain," but that Plaintiff is "grossly to morbidly obese and certainly a person with this body habitus and of his age would be expected to have back pain and probable radiculopathy from the compression on his spinal cord."  (R. 376.)

Plaintiff visited Arrowhead ER on several occasions in late 2005 and early 2006.  On December 18, Plaintiff entered the ER with complaints of shortness of breath due to bronchitis and asthma exacerbation, and a left foot sprain.  ( R. 342-43.)  On December 30, Plaintiff returned to the ER for back pain with burning in his left leg, asthma, and arthritis.  Doctors conducted thoracic and lumbar spine x-rays and found degenerative changes.  (R. 336-39.)  In January 2006, Plaintiff returned with pain, a cough, and possible pleural thickening.  (R. 333.) Doctors treated him for lower back pain, shortness of breath, and small pleural effusion. (R. 334-35.)

In April 2006, Plaintiff came to Arrowhead ER complaining of knee pain and shoulder area pain, which he said had been a dull constant pain for two months.  Doctors noted Plaintiff had bilateral chronic knee pain due to degenerative joint disease with limited range of motion and a slow gait; they gave him pain medication.  (R. 331.)  On June 15,  Plaintiff came in with bronchitis and conjunctivitis.  Doctors noted Plaintiff had used alcohol and cocaine recently.

Throughout the rest of the summer, Plaintiff began seeking treatment at United Samaritans Medical Center (hereinafter "United") ER.  On June 14, 2006, Plaintiff arrived at United complaining of shortness of breath and pain all over.  (R. 378-85.)  On June 19, Plaintiff arrived at United ER with respiratory complaints and doctors gave him Prednisone for acute

bronchitis and bronchial asthma.  (R. 388-90.)  An x-ray revealed hyperexpansion of both lung fields with chronic obstructive pulmonary disease (hereinafter "COPD") and fibrosis.  (R. 393.)

After Plaintiff's hearing with the ALJ, Plaintiff submitted the following updated medical records.

On July 11, 2006, Plaintiff went to Aunt Martha's Community Health Center (hereinafter "Aunt Martha's") with complaints of lower back pain, leg and right shoulder pain to his fingertips, swollen fingers, numbness and burning in his foot, and anxiety.  (R. 401.)  On July 27, Plaintiff returned to seek treatment for asthma, arthritis, and diabetes.  Doctors noted he had a limping gait.  (R. 396-99.)

In October 2006, Plaintiff underwent a biopsychosocial assessment at Crosspoint Human Services (hereinafter "Crosspoint").  The assessment indicated that Plaintiff reported depression, mood swings, increased anger, sleeplessness, hearing voices, decreased attention, memory impairment, social withdrawal, increased appetite, paranoia, fatigue, urges for self-harm, and problems getting along with others.  (R. 430-44.)  The therapist conducting the evaluation diagnosed major depressive disorder with psychotic features and a GAF of 50.  (R. 430-44.)  The therapist referred Plaintiff for psychiatric services.  (R. 444.)  In November, a physician at Crosspoint wrote that Plaintiff has a polysubstance disorder in partial remission, and that he assessed his GAF at 60.  (R. 449-50.)  Plaintiff continued to receive counseling and seemed to be doing better.  (R. 451-52, 458.)

Throughout the end of 2006 and 2007, Plaintiff repeatedly visited Aunt Martha's.  In November 2006, he came in asking for disability benefits for obesity and anxiety.  The doctor wrote, "I think going on disability is the worst thing he could do," but agreed to fill out the paperwork.  (R. 478.)  Plaintiff went back to Aunt Martha's in December asking for disability papers, but the hospital had already sent them.  The records shows he went to the ER three times for ear pain, constipation, and "something else minor."  (R. 477.)  In January 2007, he returned with complaints of depression and anxiety, and sought refills on a number of medications.

(R. 474.)  In February 2007, Plaintiff came in to get more disability papers signed, but he became agitated, tangential, and irrational.  (R. 473.)  After questioning Plaintiff, the doctor opined that he was having suicidal ideations.  Aunt Martha's transferred him in an ambulance to an ER. (R. 473.)  Plaintiff returned to Aunt Martha's in March 2007 with complaints of hearing voices and having the shakes for the past two weeks.  He received refills on some medications. (R. 472.)

In April 2007, Dr. Villa Senore of Aunt Martha's wrote a letter to the Social Security Administration stating that he was treating Plaintiff for diabetes, depression, bipolar disorder, COPD, asthma, morbid obesity with obstructive sleep apnea, osteoporosis, hypertension, and heart failure.  (R. 460.)  Also in April 2007, Dr. Surinderpal Kahlon, Plaintiff's treating psychiatrist, wrote a letter stating that Plaintiff suffers from depressive disorder and possible personality disorder, has severe stressors including homelessness, and has a GAF of 60. (R. 481.)  Dr. Kahlon noted that Plaintiff denied any drug use since 2005 and that he was currently on Prozac and Seroquel for his impairments.  (R. 481-82.)

### D.  The Hearing Before the ALJ

The ALJ held a hearing in August 2007, during which Plaintiff and James Lanier, a vocational expert (hereinafter "VE") testified.

In response to general background questions, Plaintiff testified that he is fifty-two years old, he is 5'5"tall, and he weighs 345 pounds.  (R. 486.)  At the time of the hearing, Plaintiff had recently moved to Illinois where he lives with his mother.  (R. 487.)  He had recently moved to Illinois after living in California for thirty-two years.  He had no sources of income.  (R. 487.) Plaintiff testified he had no medical insurance, but that he had been receiving free care at Arrowhead Medical Center in California.  (R. 488.)  Regarding his education, Plaintiff testified that he went to twelfth grade but did not graduate high school.  (R. 488.)  He reported having difficulty reading and writing, partly due to vision problems with his right eye.  (R. 489.)

Plaintiff was last employed in 2001 when he earned $22,000 working for an insurance company as a telemarketer.  Plaintiff said he left this job because he could not sit due to problems with his legs and back.  He also said he could not squeeze his fingers to push the buttons, and that his hands hurt.  (R. 489.)  His employer "let [him] go" from the job.  (R. 490.)  Plaintiff said he did not collect unemployment because he had only been at that job for a year.  Prior to 2001, Plaintiff held other telemarketing positions.  At Cosmo's Mortgage Bankers, he called homeowners to sell them insurance, and he was let go from that job due to illness.  (R. 490.)  At Senior Healthcare, Plaintiff called seniors to enroll them in an HMO.  Plaintiff said he lost that job because he could not keep up; the job required a lot of walking, and he had problems with his knees, legs, and lower back.  (R. 491.)  At Colliding Galaxy, Plaintiff worked as a customer service representative, and took phone calls from customers with complaints.  (R. 492.)

Plaintiff testified about his use of alcohol and drugs.  He initially said he had never had a problem with alcohol.  He said he did not currently use street drugs, but he had used cocaine in the past to help him with his pain, maybe ten years ago.  He said he was able to quit because he had started going to church, getting help from people, and asking God to help.  The ALJ questioned Plaintiff about an October 2004 notation in the medical record, where Dr. Simpson mentioned poly drug dependence and progressive use of alcohol and opiates.  (R. 493.)  Plaintiff said he had been drinking and using cocaine in 2004.  (R. 494.)  Plaintiff also testified that he smokes about ten cigarettes a week.  (R. 500.)

The ALJ asked Plaintiff about mental problems.  Plaintiff responded that he was under a lot of stress.  The ALJ then asked him what kind of problems he had that would keep him from working.  Plaintiff responded that problems standing and walking due to pain and swelling in his legs keep him from working, but Plaintiff did not mention any mental problems.

Plaintiff testified that his medications do not consistently relieve his pain.  He did not report any side effects.  Plaintiff said he had been taking three or four different pain killers, but now he only takes Vicodin.  (R. 495.)

The ALJ asked Plaintiff about his daily activities.  Plaintiff said his sister comes over every day, wakes him up at 10:00 a.m., and helps him wash himself.  Meals on Wheels brings food to the house for three meals a day.  Plaintiff does not prepare any food for himself or do laundry or any chores.  (R. 497.)  He does not go out for errands, but he does go to church.  (R. 498.)  The ALJ asked Plaintiff what his life was like in California.  Plaintiff said he lived there by himself for sixteen years, but that a friend would come over and help him.  He also said that he stayed in his brother's apartment, and that his brother was there off and on.  (R. 499.)

Plaintiff testified that to get to Illinois from California, he took a Greyhound bus, and the trip took about three days.  He said he had problems during this trip, including difficulty breathing due to poor air circulation on the bus, and pain in his knees and back.

Plaintiff's attorney asked Plaintiff why he could not return to work as a telemarketer.  Plaintiff said he cannot stand or sit for very long because of pain in his back, arms, and fingers, and because his hands swell.  He has difficulty holding a telephone, and problems with asthma when he talks too much.  He cannot type because his hands swell.  (R. 502.)

The VE testified.  The ALJ posed the following hypothetical question:

I would like you to consider an individual who is 52, 53 years old, 11th grade education, past relevant work as described by Mr. Profit.  An individual who is limited to medium, light, and sedentary work with the following exceptions.  No jobs that would require climbing or work at unprotected heights.  And no jobs which would require repetitive over shoulder work.  How could these restrictions affect the performance of the past relevant work?

(R. 503-04.)

The VE responded that this hypothetical individual could perform Plaintiff's past relevant work.  Specifically, this person could work in marketing and work as a customer service representative.  These jobs would not require the hypothetical individual to work in an environment with concentrated exposure to respiratory irritants, or extreme cold, heat, wetness, or humidity.  Also, these jobs would not require prolonged walking.  The positions of customer

service representative and telemarketer are listed in the *Dictionary of Occupational Titles* (hereinafter "DOT") as semiskilled sedentary work.  The VE also stated that because these positions are classified as sedentary, they would both have a sit/stand option.  (R. 504.)

Plaintiff's attorney asked the VE additional questions.  The VE testified that both the telemarketing and customer service jobs he discussed would require the hypothetical individual to grasp things with his hands and do detailed work with his fingers.  Plaintiff's attorney began to ask how swollen hands would affect ability to do this work, and the ALJ rephrased the question by inquiring what the DOT states about these two jobs in regard to fine or gross manipulation.  The VE responded that the jobs require frequent fingering and occasional reaching and handling.  (R. 505.)  Plaintiff's attorney indicated this answered her question.  Finally, the VE testified that if an individual is limited to only occasional fingering, the hypothetical individual would be unable to perform Plaintiff's past work.  (R. 506.)

### E.  The ALJ's Decision

The Social Security Administration (hereinafter "SSA") defines "disabled" as the inability "to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  To determine whether a claimant is disabled within the meaning of the Social Security Act, the ALJ must proceed through a five-step analysis.  20 C.F.R. § 416.920(a-f).  At each step, if the determination can be made, the ALJ proceeds to the next step.  20 C.F.R. § 416.920(a)(4).  If the claimant is currently employed or was previously employed during the relevant period, he is not disabled.  20 C.F.R. § 416.920(a)(4)(i).  The second question is whether the claimant has a severe impairment that will last at least twelve months.  20 C.F.R. § 416.920(a)(4)(ii).  If the claimant does not have a severe impairment, the inquiry ends.  *Id.* However, if the claimant has a severe impairment, the third step is to ask whether the severe impairment meets or equals one listed in Appendix 1 to subpart P of part 404 of Chapter 20. 20 C.F.R. § 416.920(a)(4)(iii).  If it does, the claimant is disabled.  *Id.*  If it does not, the fourth question is whether the claimant is able to perform his past relevant work with his current

impairment.  20 C.F.R. § 416.920(a)(4)(iv).  If he can, then he is not disabled.  *Id*.  If he is not able to perform his past work, the fifth and final question is whether, with his current limitations, he can perform other work that exists in significant numbers in the national economy.  20 C.F.R. § 416.920(c)(1).

Here, the ALJ first determined that Plaintiff had not engaged in substantial gainful activity since the alleged onset date.  (R. 35.)  The ALJ determined that Plaintiff has the following severe impairments:  asthma, degenerative joint disease of the spine, obesity, and residuals from his fall.  (R. 32.)  The ALJ concluded that these impairments alone or in combination are not equivalent to those listed in Appendix 1, Subpart P, Regulations No. 4. (R. 35.)  Plaintiff does not contest the ALJ's determinations at these three steps.

Next, the ALJ determined Plaintiff's RFC.  The ALJ concluded that Plaintiff has the RFC "to perform the physical exertional and nonexertional requirements of medium, light and sedentary work . . . with no prolonged walking and no climbing or work at unprotected heights. He is unable to perform any over-the-shoulder work.  He must avoid respiratory irritants, cold, heat, and humidity."  (R. 35.)  The ALJ made this determination in part because "claimant's allegations concerning the frequency and severity of his symptoms and limitations are not reasonably consistent with the objective medical evidence or other evidence in the record." (R. 33.)  The ALJ noted that Plaintiff claims he cannot work as a telemarketer because he cannot sit for very long or push buttons, "everything hurts," and his pain medication does not help. (R. 33.)  However, the ALJ indicated this is not consistent with the medical records, which show:

> [L]ittle more than a disc bulge in the cervical spine and a foot injury that healed and mild to moderate findings on x-ray.  The x-ray evidence shows his ankle fracture healed well.  There is no x-ray evidence of any other significant problem. Range of motion testing shows his motion is limited by his obesity.

(R. 33.)  The ALJ further noted Dr. Mozan's opinion that his examination did not support Plaintiff's claims of traumatically-induced pain, and he noted a number of normal findings. Dr. Mozan stated that a person of Plaintiff's age and body habitus would be expected to have

back pain and probable radiculopathy from compression on his spinal cord.  He did not believe there was any orthopedic pathology from the September 2003 injury.  (R. 33.)

The ALJ listed a number of other reasons she found Plaintiff to be not credible.  First, she noted that Plaintiff's testimony regarding his activities was inconsistent, undermining his credibility.  For example, Plaintiff was inconsistent in answering questions about where he lived in California, and Plaintiff claimed he cannot sit for too long, but he completed the trip from California to Illinois on a bus without rest or medical treatment.  The ALJ also felt that Plaintiff's claim that he earned money in 2003 by driving people around was inconsistent with his claims of pain.  Additionally, Plaintiff initially testified that he last used cocaine ten years ago, but the medical records indicate he was using alcohol and cocaine more recently.  (R. 34.)

Plaintiff also testified he has asthma that makes him unable to work.  The ALJ indicated this is not believable because Plaintiff continues to smoke cigarettes and he has not been hospitalized for breathing problems.  (R. 33.)

Because the ALJ did not find Plaintiff to be credible, she relied on the State agency's RFC assessment.  Based on Plaintiff's medical record, the State agency doctors found that Plaintiff could perform medium, light, and sedentary work with some limitations.  (R. 34.)

The ALJ then moved on to step four, assessing whether Plaintiff could return to his past relevant work.  This work included sedentary, semiskilled work as a telemarketer and customer service representative.  The ALJ relied on the VE's testimony, noting the VE said his testimony was consistent with the DOT.  The VE testified that both jobs allow for a sit/stand option.  The ALJ stated that, although Plaintiff could not perform past relevant work if he had a limitation due to swelling fingers, the medical evidence does not support this limitation.  Accordingly, the ALJ concluded that Plaintiff's RFC did not preclude him from performing his past relevant work.  (R. 34-35.)  Therefore, the ALJ concluded Plaintiff was not under a "disability" as defined in the Social Security Act.  (R. 35.)

14

## II.  Standard of Review

The ALJ's decision is subject to review pursuant to 42 U.S.C. § 405(g), which provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  The United States Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  Therefore, the question for review is not whether the claimant is disabled, but whether substantial evidence in the record supports the ALJ's finding of no disability.  *Id*.  The Court defers to an ALJ's credibility determinations, "so long as they find some support in the record."  *Edwards v. Sullivan*, 985 F.2d 334, 338 (7th Cir. 1993).


## III.  Discussion

Plaintiff argues that the Court should grant his motion for summary judgment or remand because (1) the ALJ's RFC finding is incomplete, erroneous, and not supported by substantial evidence; (2) the ALJ made an improper credibility determination; and (3) the ALJ's step four finding is erroneous.


### A.  The ALJ's RFC Determination

The ALJ determined that Plaintiff has the RFC "to perform the physical exertional and nonexertional requirements of medium, light and sedentary work . . . with no prolonged walking and no climbing or work at unprotected heights.  He is unable to perform any over-the-shoulder work.  He must avoid respiratory irritants, cold, heat, and humidity."  (R. 35.)  Plaintiff argues this RFC finding is incomplete, erroneous, and not supported by substantial evidence because (1) the ALJ erroneously relied only on a State agency opinion; (2) the ALJ ignored key evidence from physicians regarding Plaintiff's limitations; (3) the ALJ belittled Plaintiff's allegations of pain; (4) the ALJ erroneously found that Plaintiff could perform medium, light, and sedentary work; and (5) the ALJ failed to follow Regulations pertaining to obesity.

In the following analysis, the Court will only consider whether the ALJ erred by finding that Plaintiff has the RFC to perform sedentary work.  We will not address the RFC findings

15

related to medium and light work because Plaintiff had no past relevant work that was medium or light; his previous jobs as telemarketer and customer service representative are classified as semiskilled sedentary work.  Therefore, to the extent that the ALJ erred by finding Plaintiff can perform light work and medium work, this finding would constitute harmless error.

### 1.  Reliance On State Agency Opinion

Plaintiff first argues that the ALJ erroneously relied only on a State agency opinion in determining Plaintiff's RFC.  Plaintiff cites *Gudgel v. Barnhart,* 345 F.3d 467, 470 (7th Cir. 2003), to support his contention that the ALJ did not have enough medical evidence to determine Plaintiff's RFC because the only doctor who provided evidence regarding Plaintiff's RFC in this case was a State agency physician.  In *Gudgel*, the Seventh Circuit determined that a nonexamining State agency physician's opinion could not be the only basis for the ALJ's RFC when an examining physician had made a contradictory RFC finding.  However, in Plaintiff's case, the ALJ has not rejected any RFC assessments from examining physicians.  Thus, *Gudgel* is distinguishable from the circumstances of this case.

Here, the ALJ's RFC determination was consistent with SSA Regulations.  The Regulations state as follows:

> We will assess your residual functional capacity based on all of the relevant medical and other evidence . . . .  We will consider any statements about what you can still do that have been provided by medical sources, whether or not they are based on formal medical examinations . . . .  We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons.

C.F.R § 404.1545(3).  In this case, State agency physicians who had access to Plaintiff's complete medical records determined that Plaintiff is capable of medium, light, and sedentary work.  Their report contains the only assessment of RFC in the record:  Although Drs. Greenspan, Mozan, and Simpson diagnosed Plaintiff's medical conditions and tested his range of motion, they did not comment on his RFC, physical limitations, or the likely severity of his pain given those conditions.  No other physicians on record commented on Plaintiff's functional limitations.  Furthermore, the ALJ considered Plaintiff's descriptions of his

limitations and reports of pain resulting from his impairments, but the ALJ did not find these descriptions to be credible. Thus, the ALJ's decision complies with the Regulations pertaining to evidence used to assess RFC.

### 2. Plaintiff's Additional Limitations

Second, Plaintiff argues that the ALJ ignored key evidence and refused to recognize any additional limitations. Plaintiff recited a number of facts included in the medical record: Plaintiff has arthritis, arthralgias, Reiter's syndrome, residuals from a fractured ankle, residuals from a stab wound, muscle spasms, a disc bulge and degenerative changes in his spine, bone cysts in his left foot, chronic obstructive pulmonary disease, fibrosis, and deformities in one of his hands resulting from a childhood injury. Plaintiff contends these facts support his allegations of pain, swelling, and limitations in walking, standing, and use of his hands.

The ALJ "need not address every single piece of evidence in his decision, . . . but his analysis must build an accurate and logical bridge between the evidence and his findings." *McKinnie v. Barnhart*, 368 F.3d 907, 910 (7th Cir. 2004). Here, the ALJ built an accurate and logical bridge between the evidence and the RFC determination. In doing so, the ALJ specifically addressed two of the items that Plaintiff contends she ignored. The ALJ observed that Plaintiff's allegations concerning the frequency and severity of his symptoms and limitations were not consistent with objective medical evidence. The ALJ noted that Plaintiff has not been hospitalized for breathing problems, that "objective evidence shows little more than a disc bulge in the cervical spine and a foot injury that healed," that there is no x-ray evidence of any significant problem, and that range of motion testing shows his motion is limited by obesity. Dr. Mozan opined that he did not observe any residual orthopedic pathology from the September 2003 injury. The ALJ also explained her reasons for rejecting Plaintiff's claims regarding his pain and limitations, discussed in the following section on Plaintiff's credibility. With this analysis, the ALJ has adequately built a bridge between the evidence and the RFC determination, and she did not err by failing to mention all of Plaintiff's cited evidence.

17

### 3.  Plaintiff's Reports of Pain

Third, Plaintiff argues that the ALJ's RFC is erroneous because the ALJ belittled Plaintiff's claims of pain.  Specifically, Plaintiff contends that reports from Drs. Greenspan and Mozan substantiate Plaintiff's complaints of pain and show that Plaintiff's purported limitations are credible and consistent with his obesity and other impairments.  Plaintiff cites a number of the doctors' reports.  The medical evidence that is most pertinent to Plaintiff's ability to perform sedentary work involves tenderness and sprains in his cervical and lumbar spine and associated pain and muscle spasms upon moving.

In determining the extent to which pain affects a claimant's capacity to perform basic work activities, the SSA Regulations provide:

> We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence, including your medical history, the medical signs and laboratory findings, and statements by your treating or examining physician or psychologist or other persons about how your symptoms affect you.  Your symptoms, including pain, will be determined to diminish your capacity for basic work activities to the extent that your alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence.

20 C.F.R. § 404.1529(c)(4).  Accordingly, the issue is whether Plaintiff's complaints of pain can reasonably be accepted as consistent with the findings of Drs. Greenspan and Mozan.  The Seventh Circuit has stated that ordinarily, judicial review of an ALJ's determination that a claimant has exaggerated the severity of his pain is limited, unless the ALJ's credibility determination is based on objective factors such as errors in reasoning rather than merely the demeanor of the witness.  *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004).

Here, the ALJ concluded that Plaintiff's claim that severe pain made him unable to perform his sedentary past relevant work was not reasonably consistent with the medical evidence.  The ALJ relied on medical signs and laboratory findings, including an x-ray showing a disc bulge in Plaintiff's cervical spine and Dr. Mozan's observation of a lack of muscle spasticity or atrophy.  The ALJ also noted Dr. Mozan's opinion that his examination did not

support Plaintiff's claims of any traumatically-induced pain and did not reveal any residual orthopedic pathology from Plaintiff's accident.  (R. 33.)  The ALJ's discussion of this evidence shows that she considered the conflict between Plaintiff's claims of severe pain and the medical signs and laboratory findings, medical history, and statements by examining physicians, as required by 20 C.F.R. § 404.1529(c)(4).  Substantial evidence supports the ALJ's subsequent determination that this evidence could not reasonably be accepted as consistent with the objective medical evidence and other evidence.  Furthermore, the ALJ based this conclusion in part on her determination that Plaintiff is not credible; as discussed below, the ALJ did not err by making this credibility determination.  Accordingly, the Court cannot conclude that the ALJ erred by finding that she could not reasonably accept Plaintiff's claims regarding the severity of his pain.

### 4.  ALJ's RFC Determination Regarding Medium, Light, or Sedentary Work

Plaintiff next argues that the ALJ's RFC finding that Plaintiff could perform medium and light work is erroneous because the ALJ acknowledged that Plaintiff's impairments preclude prolonged walking.  Plaintiff contends this is inconsistent with SSR 83-14, which notes that light work requires a person to stand or walk most of the day.  Plaintiff also points out that the VE never testified that Plaintiff could perform the requirements of light and medium work.  Although Plaintiff nominally included sedentary work in this section, he did not argue that sedentary work would be inconsistent with a limitation on prolonged walking.

To the extent that the ALJ's RFC finding that Plaintiff can perform light or medium work is fundamentally inconsistent with the RFC restriction against prolonged walking, this constitutes harmless error because the ALJ's conclusion that Plaintiff was not disabled was based on her step four finding that Plaintiff could perform his past relevant work, all of which was sedentary.  The VE testified that because these jobs are classified as sedentary work, they would all have a sit/stand option.  Accordingly, the Court concludes the ALJ did not err by determining Plaintiff has the RFC to perform sedentary work with no prolonged walking and other limitations indicated by the ALJ.

19

### 5.  Plaintiff's Obesity

Plaintiff contends that the ALJ failed to discuss and follow SSR 02-1p, which states that an ALJ must consider the combined effects of obesity with other impairments in making an RFC determination.  Specifically, Plaintiff notes that he has musculoskeletal impairments that are aggravated by obesity.  Plaintiff contends the ALJ failed to consider that these impairments result in more pain and more limitations in combination than either impairment would create alone.

The Commissioner responds that the ALJ did not have to consider SSR 02-1p because the medical record contains no reference to any specific limitations caused by obesity.  In the alternative, the Commissioner argues that the ALJ satisfied the requirements of SSR 02-1p by specifically stating that she considered Plaintiff's obesity in her RFC finding, and that she considered the combined effect of Plaintiff's impairments by including all of Plaintiff's limitations to the VE in the hypothetical question.

In determining Plaintiff's RFC, the ALJ acknowledged Plaintiff's obesity and discussed its effect on his functional limitations.  First, the ALJ noted that range of motion testing shows Plaintiff's obesity limits his range of motion.  Second, the ALJ referred to Dr. Mozan's statement that a person of Plaintiff's body habitus and age would be expected to have back pain and probable radiculopathy from compression on his spinal cord.  Third, the ALJ noted that Plaintiff cannot climb or work at unprotected heights due to obesity.  Fourth, he is unable to perform any over-the-shoulder work due to back/shoulder/all-over pain from his fall.  The ALJ stated, "[t]hese limitations are due to all his impairments mentioned in the record including obesity." (R. 34.)  The ALJ also stated that "[t]he claimant has not demonstrated that his impairments in combination including obesity would prevent him from performing medium, light, and sedentary work."  (R. 34.)

The ALJ indicated her awareness that Plaintiff's musculoskeletal impairments were aggravated by obesity due to compression of the spinal cord.  She stated that the limitations in the RFC were due to all of his impairments mentioned in the record, including obesity.  Based on

the ALJ's explanation, the Court cannot conclude that the ALJ failed to adequately consider Plaintiff's obesity in combination with his other impairments when determining Plaintiff's RFC.

### B.  Credibility Assessment

This Court gives considerable deference to an ALJ's credibility finding and will not overturn it unless a plaintiff can show that those findings are patently wrong.  *Urban v. Sullivan*, 799 F. Supp. 908, 911 (C.D. Ill. 1992).  However, when credibility determinations rest on objective factors or fundamental implausibilities rather than subjective considerations, reviewing courts have more freedom to review the ALJ's credibility determination.  *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994).  An ALJ's credibility assessment will stand "as long as [there is] some support in the record."  *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) (quoting *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007)).

The ALJ stated that "[t]he claimant is not credible in his subjective self-serving statements that he is unable to work."  (R. 34.)  In reaching that conclusion, the ALJ noted the following:  (1) in 2003, while Plaintiff claimed to be disabled, he was working as a van driver; (2) Plaintiff testified he last used cocaine ten years ago, but the medical records indicate he had used alcohol and cocaine more recently; (3) Plaintiff's testimony contained certain inconsistencies, including his varying answers about where he lived in California; and (4) Plaintiff's statement that he cannot sit for any length of time was inconsistent with his testimony that he rode on a bus from California to Illinois with no rest or medical attention.

In his brief, Plaintiff attempts to explain these inconsistencies and present them in the best possible light.  For example, Plaintiff contends that his relapse with cocaine should not undermine his credibility because he only resumed the use of drugs and alcohol in an attempt to alleviate his pain; thus according to Plaintiff, his relapse demonstrates his pain was severe enough for him to self-medicate.  Plaintiff also contends that his inconsistent testimony about where he lived in California was inadvertent and insignificant.  However, an ALJ is not required to make all inferences regarding credibility in Plaintiff's favor.  Given the inconsistencies in Plaintiff's testimony and the ALJ's explanation of her credibility assessment, this Court cannot

21

conclude that the ALJ was patently wrong when she concluded that Plaintiff was not entirely credible.

### C.  Determination that Plaintiff Can Perform Past Relevant Work

Plaintiff next argues that the ALJ erroneously determined that Plaintiff could perform his past relevant work (hereinafter "PRW") because (1) the ALJ failed to satisfy the requirements of SSR 82-62 in considering whether Plaintiff was capable of performing his PRW; and (2) the ALJ erred by relying on the VE's testimony.

SSR 82-62 provides that if a plaintiff has the RFC to perform his PRW either as he performed it or as it is performed in the national economy, then the plaintiff is not disabled.  SSR 82-62.  First, Plaintiff contends that the ALJ failed to adequately consider whether Plaintiff was capable of performing his PRW using either test – i.e., either as he performed it *or* as it is performed generally.  The Court disagrees.  The ALJ's references to the VE's testimony and the DOT show that she assessed Plaintiff's ability to perform his PRW based on how the jobs of telemarketer and consumer service representative are performed generally.

Plaintiff also contends that the ALJ failed to explain her rationale at step four.  To determine whether a claimant has the RFC to perform his PRW, the ALJ must make and explain the following specific findings of fact:  (1) the individual's RFC, (2) the physical and mental demands of the past work, and (3) that the individual's RFC would permit his return to his past work.  SSR 82-62, *4.  To justify these findings, the ALJ must write her decision such that "a clear picture of the case can be obtained.  The rationale must follow an orderly pattern and show clearly how specific evidence leads to a conclusion."  SSR 82-62, *4.  If the claimant retains the capacity to perform the functional demands and job duties of particular PRW as ordinarily required by employers throughout the national economy, as described in the DOT, then the claimant is not disabled.  SSR 82-61.  Plaintiff contends the ALJ's erroneous determination that Plaintiff can perform his PRW and failure of rationale are harmful errors because if Plaintiff is found unable to perform his past work, he is disabled under the grids.  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.10.

22

Here, the ALJ made the three required findings of fact.  After the ALJ determined Plaintiff's RFC, she noted that Plaintiff worked as a telemarketer and customer service representative.  The DOT classifies these positions as semiskilled sedentary work.  The ALJ noted the VE's testimony that these jobs would allow a sit/stand option.  The VE also testified that these jobs would not involve prolonged walking or exposure to respiratory irritants.  Because Plaintiff's PRW is ordinarily classified as sedentary work, the ALJ determined that this work was consistent with Plaintiff's RFC of medium, light, or sedentary work with no prolonged walking and other limitations.  Given this clear reasoning, the Court cannot conclude that the ALJ failed to meet the requirements of SSR 82-62.

Furthermore, SSA Regulations provide that a claimant who is limited to sedentary work, is closely approaching advanced age, has less than a high school education, and has semiskilled previous work experience, is not disabled as long as the previous work was sedentary or provided skills that are transferable to sedentary work.  20 C.F.R. § 404. Subpt. P, App. 2, Table 1.  Here, Plaintiff's PRW was semiskilled sedentary work.  Therefore, Plaintiff is not disabled under the Regulation's grids.

Second, Plaintiff argues that the ALJ erred by relying on the VE's testimony.  Plaintiff argues that, to the extent the ALJ based her determination that Plaintiff can perform his PRW on his work as it is generally performed, the ALJ erred because there is a discrepancy between the VE's testimony and the DOT.  Plaintiff asserts that the DOT lists the customer service position as light work that requires frequent reaching, and thus it is inconsistent with Plaintiff's limitations; the telemarketer job is also inconsistent with Plaintiff's limitations because it requires occasional reaching and the ALJ precluded all overhead reaching.  Thus, Plaintiff contends that the ALJ failed to meet the requirements of SSR 00-4p, which states "[w]hen there is an apparent unresolved conflict between VE . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence."

An ALJ must explain any conflict between VE's testimony and the DOT only if the discrepancy was "identified" -- that is, if the claimant, or the ALJ on his behalf, noticed the

conflict and asked for substantiation.  *Donahue v. Barnhart*, 279 F.3d 441, 447 (7th Cir. 2002).
Furthermore, raising a discrepancy between the VE's testimony and the DOT after the hearing is
too late.  *Id.*  Plaintiff did not identify any discrepancies at the hearing.  Thus, notwithstanding
Plaintiff's assertions of conflicts between the VE and the DOT, the ALJ appropriately relied on
the VE's testimony.  Accordingly, this Court cannot conclude that the ALJ erred by relying on
VE testimony that Plaintiff now contends is inconsistent with DOT.

Last, Plaintiff contends that the ALJ failed to fulfill her affirmative obligation under
SSR 00-4p to ask about any possible conflict between the VE evidence and the information
provided in the DOT.  Although the ALJ has a duty to question the VE about any inconsistencies
with the DOT and resolve that conflict before relying on the VE's testimony, the failure to do so
is not automatically reversible error, especially when the basis of the VE's conclusions is not
questioned at the hearing.  *Donahue,* 279 F.3d at 446.  Furthermore, in this case, though the ALJ
did not specifically ask the VE if all of his testimony was consistent with the DOT, the ALJ did
ask the VE whether the jobs of customer service representative and telemarketer were "listed as"
sedentary, and the VE responded that the jobs were sedentary.  Because the ALJ asked the VE
how these jobs were "listed," inquiring as to how they are listed in the DOT, it was unnecessary
for her to follow up that response by specifically asking if the response was consistent with the
DOT.  Accordingly, the Court cannot conclude that the ALJ committed reversible error by
failing to ask the VE if his testimony was consistent with the DOT.

## IV.  Summary

For the reasons set forth above, this Court recommends that Plaintiff's Motion for
Summary Judgment or Remand **(#17)** be **DENIED** pursuant to sentence four of 42 U.S.C.
§ 405(g).[1]  The parties are advised that any objection to this recommendation must be filed in
writing with the clerk within ten (10) working days after being served with a copy of this Report

---

[1]Under 42 U.S.C. § 405(g), sentence four, "[t]he court shall have the power to enter, upon
pleadings and transcripts of the record, a judgment affirming, modifying, or reversing the
decision of the Commissioner of Social Security, with or without remanding the cause for a
hearing."

and Recommendation.  *See* 28 U.S.C § 636(b)(1).  Failure to object will constitute a waiver of objections on appeal.  *Video Views, Inc. v. Studio 21, Ltd.*, 797 F.2d 538, 539 (7th Cir. 1986).

ENTER this 18th day of August, 2008.

_____ s/ DAVID G. BERNTHAL _____
U.S. MAGISTRATE JUDGE

25